UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
JOSEPH ZAPPIA,

                  Plaintiff,

        v.

GAN LIMITED, SEAMUS MCGILL,
MICHAEL SMURFIT, DAVID GOLDBERG,
SUSAN BRACEY, and ERIC GREEN,

                Defendants.

Case No. 24-cv-00032

**COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Joseph Zappia ("Plaintiff"), by the undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to Plaintiff's own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

## <u>NATURE OF THE ACTION</u>

1.    This action is brought by Plaintiff against GAN Limited ("GAN" or the "Company") and the members of the Company's Board ("Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"). Plaintiff's claims arise in connection with the solicitation of GAN's public stockholders to vote in favor of a merger transaction ("Merger") pursuant to which GAN will merge into an affiliate of SEGA SAMMY CREATION INC. ("SSC") in exchange for a payment of $1.97 per share in cash. SSC is a subsidiary of SEGA SAMMY HOLDINGS INC., which is the holding company of the SEGA SAMMY Group (collectively,

"SEGA").

2.      On November 7, 2023, GAN issued a press release announcing that, based upon the recommendation of a special committee purportedly comprised "solely of independent directors," the Board had approved the sale of the Company to SEGA for $1.97 per share in cash ("Merger Consideration"), pursuant to a merger agreement ("Merger Agreement").

3.      On December 15, 2023, Defendants authorized the filing of a false and misleading preliminary proxy on Schedule 14A ("Proxy") with the SEC with the aim of soliciting GAN stockholders to vote for the Merger. As the Proxy states, "[t]he GAN board of directors is soliciting your proxy." The Proxy, however, contains material misrepresentations and omissions, and therefore violates Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

4.      The Proxy advises that a special meeting ("Special Meeting") of GAN stockholders will be held on a date yet to be determined, to vote on the Merger ("Stockholder Vote"). The Proxy further advises GAN stockholders that "[y]our vote is very important. ***Regardless of the number of ordinary shares you own***, and whether or not you plan to attend the special general meeting, we hope that you will vote as soon as possible." The Proxy further advises that the Merger "cannot be approved (and the merger cannot be completed) without the affirmative vote (in person or by proxy) of a simple majority of votes cast by holders of [GAN] ordinary shares present (in person or by proxy) at the [Special Meeting]."

5.      The material misrepresentations and omissions in the Proxy must be cured in advance of the Stockholder Vote to enable GAN stockholders to cast informed votes with respect to the Merger. Therefore, Plaintiff seeks to enjoin the Defendants from taking any further steps to consummate the Merger and schedule the Stockholder Vote, until such violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover damages

suffered by Plaintiff and other GAN stockholders as a result of such violations, and/or seek other appropriate relief.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.      This Court has personal jurisdiction over each of the Defendants because each has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at \*5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being hauled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiff's securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at \*23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

8.      Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, the Company's common stock trades under the ticker "GAN" on Nasdaq, which is headquartered in this District, and the false and misleading Proxy was filed with the SEC, which has a regional office in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144

(2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

## PARTIES

9.      Plaintiff is and has been a stockholder of GAN common stock at all relevant times.

10.     Defendant GAN is a Bermuda corporation with its principal executive offices located at 400 Spectrum Center Drive, Suite 1900, Irvine, CA 92618. GAN is a (i) supplier of business-to-business ("B2B") software solutions for online casino gaming and online sports betting applications, and (ii) developer and operator of a business-to-consumer ("B2C") online sports betting and casino platform, which offers consumers in select markets in Northern Europe, Latin America and Canada a digital portal for engaging in sports betting, online casino games and poker.

11.     Defendant Seamus McGill presently serves as Chairman of the Board and Interim Chief Executive Officer ("CEO") of GAN, and served as a member of the Board at all relevant times. Defendant McGill was appointed Interim CEO effective September 26, 2023, following the resignation of Dermot Smurfit, as GAN's CEO and as a member of the Board, on September 25, 2023.

12.     Defendant Michael Smurfit served as a member of the Board at all relevant times. On December 22, 2023, GAN announced that Defendant Smurfit had provided notice of his resignation from the Board, effective December 31, 2023. GAN further announced that, effective December 20, 2023, David D. Ross had been appointed to the Board.

13.     Defendant David Goldberg served as a member of the Board at all relevant times.

4

14.     Defendant Susan Bracey served as a member of the Board at all relevant times.

15.     Defendant Eric Green served as a member of the Board at all relevant times.

16.     Defendants identified in paragraphs 11 to 15 are collectively referred to herein as the "Individual Defendants," and together with GAN, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS[1]

### GAN Receives Initial Bids for an Acquisition

17.     On September 30, 2022, GAN received a preliminary non-binding indication of interest ("IOI") from a publicly-traded holding company with major online sports betting and online casino gaming brands (Bidder A) to acquire GAN's B2C sports betting business for a valuation equal to 6.0 to 8.0 times pro-forma earnings before interest, taxes, depreciation, and amortization ("EBITDA"), subject to due diligence. Negotiations terminated without Bidder A submitting a letter of intent.

18.     On January 13, 2023, GAN received a preliminary non-binding IOI from a vertically integrated online iGaming operator (Bidder B) to acquire GAN's B2C sports betting business for a purchase price of $98 million on a cash-free, debt-free basis. The IOI provided that $35 million of the purchase price would be paid at closing, with the remaining $63 million payable upon achievement of performance-based milestone targets. The Board determined this offer was inadequate and rejected it.

19.     On January 19, 2023, GAN received a preliminary non-binding IOI from a European-based online gambling company offering online sports betting and online casino gaming through a variety of brands (Bidder C). The IOI valued GAN's B2C sports betting business at $30 million, payable in cash in two installments. The Board determined this offer was inadequate and

---

[1] Any emphasis in quoted language is added, unless otherwise noted.

rejected it.

20.     The Proxy does not disclose whether Bidders A, B and/or C entered into confidentiality agreements with GAN, and if so, whether such agreements contained standstill provisions, and if so, whether such standstill provisions fell away if a merger transaction was announced.

**SEGA Provides GAN With Financing**

21.     In January 2023, GAN began to evaluate alternatives to refinance its $30 million term loan with Beach Point Capital Management LP ("Beach Point").

22.     On March 14, 2023, GAN contacted a financial advisor, B. Riley, to assist with evaluating options for securing additional equity financing or re-financing the $30 million term loan. At the request of a special committee of the Board ("Financing Special Committee"), B. Riley began discussions with several U.S.-based sports betting and casino operators, including Bidder D, Bidder E and Bidder F. The Proxy fails to disclose, however, when the Financing Special Committee was formed, what actual or potential conflicts prompted the formation of the Financing Special Committee, and the identity of the Board members appointed to serve on the Financing Special Committee. Separately, the Proxy also fails to disclose whether Bidders D, E and/or F entered into confidentiality agreements with GAN, and if so, whether such agreements contained standstill provisions, and if so, whether such standstill provisions fell away if a merger transaction was announced.

23.     On March 27, 2023, GAN and SEGA entered into a confidentiality agreement in connection with discussions regarding a refinancing of the $30 million term loan.

24.     On April 13, 2023, GAN entered into an amendment to the credit facility for the $30 million term loan, Beach Point assigned its position under the credit facility to an affiliate of

SEGA, and GAN entered into a second amendment to the credit facility with an affiliate of SEGA under which, among other things, GAN borrowed an additional $12 million.

**Negotiation of the Merger With SEGA**

25.     On April 18, 2023, GAN provided SEGA with access to GAN's virtual data room.

26.     On May 12, 2023, SEGA delivered a non-binding letter of intent to GAN, proposing to acquire all of the outstanding shares of GAN for a range of $1.46 to $2.12 per share in cash. On May 15, 2023, in response to SEGA's proposal to acquire GAN, the Board established a second special committee ("Merger Special Committee"), and delegated to it the authority to evaluate strategic transactions including the sale of all or part of GAN. The Proxy fails to disclose, however, what actual or potential conflicts prompted the formation of the Merger Special Committee, and the identity of the Board members appointed to serve on the Merger Special Committee.

27.     On May 23, 2023, SEGA submitted a revised non-binding letter of intent to GAN, proposing to acquire all of the outstanding shares of GAN for a range of $1.80 to $2.20 per share in cash.

28.     On July 3, 2023, representatives of an online sportsbook operator (Bidder G) corresponded with representatives of B. Riley regarding Bidder G's proposal to operate GAN's B2C sports betting business under a multi-year license arrangement with an option to purchase the business at the end of the license term.

29.     On July 18, 2023, a U.S. based casino operator (Bidder H) submitted a non-binding IOI to GAN proposing to acquire GAN through a reverse merger whereby Bidder H would (i) complete a pending disposition of a portion of its business and then (ii) combine its business operations with those of GAN. Bidder H's IOI contemplated that, immediately following the

closing of the transaction with GAN, Bidder H's shareholders would own 80% of the outstanding equity of the combined company, and GAN stockholders would own 20% of the outstanding equity of the combined company.

30.     On July 21, 2023, a sports betting operator in Europe (Bidder I) submitted a non-binding letter of intent to GAN proposing to acquire GAN's B2C sports betting business for cash at a valuation of 4.0 to 6.5 times trailing 12 month adjusted EBITDA.

31.     On July 24, 2023, the Merger Special Committee met with representatives of B. Riley to review each of the proposals received to date: the all-cash offer from SEGA as reflected in its May 23, 2023 revised non-binding letter of intent; the proposal to license the sports betting business to Bidder G; the reverse merger proposal from Bidder H; and the offer for the B2C sports betting business from Bidder I. After discussion and evaluation, the Merger Special Committee determined to not enter into any of the proposed non-binding letters of intent or indications of interest on the terms presented, and directed B. Riley to continue negotiations to seek better terms from each bidder.

32.     On August 1, 2023, SEGA submitted a revised non-binding letter of intent to GAN, proposing to acquire all of the outstanding shares of GAN for a price of $2.51 per share in cash.

33.     On August 5, 2023, Bidder H submitted a revised non-binding IOI to GAN proposing to acquire GAN through a reverse merger. The revised IOI contemplated that, immediately following the closing of the transaction with GAN, Bidder H's shareholders would own 70% of the outstanding equity of the combined company, and GAN stockholders would own 30% of the outstanding equity of the combined company. The Merger Special Committee determined, after consultation with B. Riley, that the valuation for GAN implied by the revised IOI submitted by Bidder H was less than the all-cash proposal of $2.51 per share in cash

8

contemplated by the revised non-binding letter of intent received from SEGA on August 1, 2023. The Proxy fails to quantify, however, the valuation implied by Bidder H's proposal.

34.     On August 7, 2023, representatives of SEGA's financial advisor, SMBC Nikko, submitted a further revised non-binding letter of intent on behalf of SEGA to B. Riley, which included a $2.51 cash per share purchase price subject to a working capital adjustment, a non-solicitation provision, and a 30-day exclusivity period with an automatic 30-day extension.

35.     On August 28, 2023, after discussion with B. Riley of the terms of the most recent proposals from SEGA, Bidder G, Bidder H, and Bidder I, the Merger Special Committee authorized GAN to enter into SEGA's most recent non-binding letter of intent.

36.     Subsequently, due to purported concerns over new regulatory and other developments impacting GAN's business, SEGA reduced its bid from $2.51 to $1.90 per share in cash. Thereafter, following further negotiations, the parties agreed upon a price of $1.97 per share in cash.

37.     On November 7, 2023, B. Riley orally shared its opinion ("Fairness Opinion") with the Merger Special Committee that $1.97 per share consideration offered by SEGA was fair to the holders of GAN's common shares. Thereafter, after further discussion, the Merger Special Committee unanimously determined to recommend to the Board to approve the Merger. Based upon the recommendation of the Merger Special Committee and other factors specified in the Proxy, the Board unanimously approved the Merger and recommended that GAN stockholders vote in favor of the Merger.

38.     As positive factors supporting the Board's approval of the Merger, the Proxy lists the following factors, among others:

- The Fairness Opinion

- "That since January 2021 through the time GAN entered into the merger agreement with SSC, GAN persistently sought a strategic transaction through multiple processes with multiple financial advisors. During that time, dozens of leading gaming industry participants in the casino, online casino and online sports betting industries throughout the world were approached on behalf of GAN and ***no party expressed a willingness to make an offer in excess of the $1.97 per ordinary share SSC has agreed to pay***;"

- "The possibility that, if GAN did not enter into the merger agreement, there would likely be few, if any, ***other parties that would be willing to make an offer in excess of SSC's offer of $1.97 per ordinary share***;" and

- "The terms of the merger agreement permitting GAN to consider a "superior proposal" received after November 7, 2023 and at any time prior to approval of the merger proposal by GAN shareholders."

39.    On November 7, 2023, GAN issued a press release announcing the Merger.

**Bermuda Appraisal Rights**

40.    The Proxy advised GAN stockholders concerning their appraisal rights under

Bermuda law in relevant part:

> Under Bermuda law, in the event of a merger of a Bermuda company with another Bermuda company or foreign corporation, any shareholder of the Bermuda company is entitled to receive fair value for its shares. For purposes of Section 106(2)(b)(i) of the Bermuda Companies Act, the GAN board of directors considers the fair value for each ordinary share to be $1.97, without interest and subject to any applicable tax withholding.
>
> GAN shareholders who are not satisfied that they have been offered fair value for their ordinary shares and whose shares were not voted in favor of the merger proposal, may exercise their appraisal rights under Section 106(6) of the Bermuda Companies Act to have the fair value of their shares appraised by the Supreme Court of Bermuda. Persons owning beneficial interests in shares but who are not shareholders of record should note that only persons who are shareholders of record are entitled to make an application for appraisal. Any GAN shareholder intending toexercise appraisal rights must file their application for the appraisal of the fair value of their shares with the Supreme Court of Bermuda within one month of the date the notice convening the special general meeting to approve the merger has been given. The notice, substantially in the form set out at pages I and II of this proxy statement, and delivered with this proxy statement shall constitute this notice. There are no statutory rules and limited trial decisions of the Supreme Court of Bermuda detailing the operation of the appraisal rights set forth in Section 106 of

the Bermuda Companies Act or the process of appraisal by the Supreme Court of Bermuda. Accordingly, the Supreme Court of Bermuda retains considerable discretion in determining the methodology to be used when appraising the fair value of shares pursuant to Section 106(6) of the Bermuda Companies Act.

If, at the special general meeting, a GAN shareholder votes in favor of the merger proposal, such shareholder will have no right to apply to the Supreme Court of Bermuda for an appraisal of the fair value of its shares, and instead, if the merger is consummated, and as discussed in the section of this proxy statement titled "The Merger Agreement — Effects of the Merger," each ordinary share of such shareholder will be canceled and converted into the right to receive the merger consideration. Voting against the merger, or not voting, will not in itself satisfy the requirements for notice and exercise of a shareholder's right to apply for appraisal of the fair value of its shares.

## The Proxy Contains Material Omissions That Render Statements Therein Misleading

41.     Defendants disseminated a false and misleading Proxy to GAN stockholders that makes partial disclosures and omits material information that render statements in the Proxy misleading, and thus deprive Plaintiff and other GAN stockholders of their right to cast fully informed votes with respect to the Merger.

### *Material Omissions Concerning the Formation of the Financing Special Committee and the Merger Special Committee, and the Identities of the Members of Such Committees*

42.     With respect to conflicts affecting board members, "the relevant inquiry is not whether an actual conflict of interest exists, but rather whether full disclosure of potential conflicts of interest has been made." *Wilson v. Great Am. Indus., Inc*., 855 F.2d 987, 994 (2d Cir. 1988). The existence of potential conflicts affecting committee members tasked with managing a sales process is particularly important since such biases could plausibly result in committee members negotiating for a less than optimal price. Accordingly, a proxy must disclose the identity of committee members tasked with managing a sales process. Such disclosure is material since it enables stockholders to determine the existence of potential conflicts. *Chen v. Select Income REIT*, 2019 WL 6139014, at *2, 13 (S.D.N.Y. Oct. 11, 2019) (identities of Committee members not

disclosed; missing information was material for purposes of identifying conflicts of interest); *van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) ("The vague language regarding the identities of the negotiators prohibited Opower stockholders from determining the interests of those fiduciaries who negotiated the deal on behalf of the stockholders, which I find to be a material disclosure violation.")

43.     Here, the Proxy discloses that the Financing Special Committee had been formed to evaluate alternatives to refinance GAN's $30 million term loan with Beach Point. The Financing Special Committee subsequently negotiated a refinancing of the term loan with SEGA that provided GAN with an additional $12 million in financing.

44.     The Proxy further discloses that, on May 15, 2023, following receipt of an initial non-binding letter of intent from SEGA to acquire all of the outstanding shares of GAN, the Board established the Merger Special Committee, and gave the Merger Special Committee the authority to evaluate strategic transactions including the sale of all or part of GAN. In an effort to persuade GAN stockholders to approve the Merger, the Proxy touts at least three times that the Merger Special Committee was purportedly "comprised solely of independent directors."

45.     The Proxy fails to disclose, however, what actual and/or potential conflicts prompted the formation of the Financing Special Committee and the Merger Special Committee. Nor does the Proxy disclose the identities of the Board members appointed to the Financing Special Committee or to the Merger Special Committee. Having disclosed the formation of these two Special Committees—and especially having repeatedly touted the independence of the Merger Special Committee as part of its pitch to persuade GAN stockholders to vote for the Merger—the Proxy must be honest and complete about these topics by disclosing the actual or potential conflicts that prompted the formation of the two Special Committees, and the identities of the members of

those Special Committees. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *see also Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 4443258, at *10 (S.D.N.Y. Sept. 27, 2021).

46.     In particular, the failure to identify the members of the Merger Special Committee makes it impossible for GAN stockholders to determine whether in fact those Board members were truly independent—as the Proxy repeatedly touts—in terms of being able to evaluate the proposals submitted by SEGA and other bidders based solely on the merits of such proposals without being unduly influenced by any biases caused by actual or potential conflicts. To the extent that any of the members of the Merger Special Committee had actual or even only potential conflicts, then the statements in the Proxy repeatedly touting that the members of the Merger Special Committee were "independent" were false and misleading.

47.     Based on the foregoing, the actual or potential conflicts that prompted the formation of the Financing Special Committee and the Merger Special Committee, and the identities of the members of the Financial Special Committee and the Merger Special Committee, must be disclosed well in advance of the Stockholder Vote to enable GAN stockholders to cast fully informed votes with respect to the Merger.

***Material Omissions Concerning Potential Conflicts Affecting B. Riley***

48.     Because of the central role played by financial advisors in negotiating transactions, applicable law requires full disclosure of potential (not just actual) conflicts affecting such advisors. That is, "the relevant inquiry is not whether an actual conflict of interest exists, but rather whether full disclosure of potential conflicts of interest has been made." *See Wilson*, *supra*. Without full disclosure concerning even potential conflicts affecting financial advisors,

stockholders are unable to understand what factors might have influenced the financial advisor's analytical efforts in preparing a fairness opinion, and are therefore unable to cast fully informed votes. With full disclosure of potential conflicts affecting financial advisors, shareholders can judge for themselves what significance to attribute to potential conflicts that might have undermined the loyalty of such advisors in representing shareholders in connection with a merger. *See Wilson*, *supra*. When a financial advisor faces a potential conflict, the law requires not just disclosure of the conflicting relationship itself, but also the amount of fees the advisor received in connection with such relationship. *See Chen*, 2019 WL 6139014, at *2, 13.

49.     Here, the Merger Special Committee retained B. Riley as its financial advisor with respect to the Merger. Concerning potential conflicts of B. Riley, the Proxy states that "B. Riley and its affiliates ***have in the past provided***, and may in the future provide, investment banking and other financial services to GAN, ***SSC and their respective affiliates***, ***for which B. Riley and its affiliates have received***, or would expect to receive, ***compensation***, including, during the past two years, having acted as financial advisor to GAN in connection with the refinancing of certain of its indebtedness for which B. Riley received aggregate compensation of approximately $2.5 million." The failure to disclose whether B. Riley provided services to SSC and its affiliates, and the amount paid for such services, during the two years prior to the date of the Fairness Opinion, renders the above statement misleading since reasonable GAN stockholders cannot determine whether, in fact, B. Riley's prior services to SSC and its affiliates, and the amounts paid for such services, pose a potential conflict. *See Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 302 (D. Conn. 2021); *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 91 (D. Conn. 2019).

50.     Further, having partially disclosed that B. Riley has "in the past" provided "investment banking and other financial services" to SSC and its respective affiliates, and received

"compensation" for such services, the disclosures in the Proxy on this topic must be honest and complete concerning the nature of the services provided by B. Riley to SSC and its affiliates (including other members of SEGA Sammy Group), *and* the amount of compensation paid to B. Riley for such services, to the extent such services were provided by B. Riley to any entities affiliated with the SEGA Sammy Group within two years prior to the date of the Fairness Opinion. *See Vivendi*, *supra.*

**Material Omissions Concerning Any Confidentiality Agreements Entered Into With Bidders A, B, C, D, E, F, G, H and/or I**

51.     The Proxy already discloses that, on March 27, 2023, GAN entered into a confidentiality agreement with SEGA. The Proxy further discloses that, at various times, the Financing and Merger Special Committees engaged in negotiations with third parties identified as Bidders A, B, C, D, E, F, G, H and I. The Proxy fails to disclose, however, whether GAN ever entered into confidentiality agreements with any such other bidders, and if so, whether such agreements contained standstill provisions, and if so, whether any such standstill provisions fell away in the event a merger transaction was announced. Having disclosed that GAN entered into a confidentiality agreement with SEGA, the Proxy must also disclose whether GAN entered into confidentiality agreements with any of the other bidders and the terms of any standstill provisions in any such agreements. *See Vivendi*, *supra; see also In re Columbia Pipeline Grp., Inc.*, 2021 WL 772562, at *33 (Del. Ch. Mar. 1, 2021).

52.     In particular, as positive factors in favor of approving the Merger, the Proxy states:

(i) "since January 2021 through the time GAN entered into the merger agreement with SSC, GAN persistently sought a strategic transaction through multiple processes with multiple financial advisors [and] [d]uring that time, dozens of leading gaming industry participants in the casino, online casino and online sports betting industries throughout the world were approached on behalf of GAN and ***no party expressed a willingness to make an offer in excess of the $1.97 per ordinary share SSC has agreed to pay***;"

(ii) "[t]he possibility that, if GAN did not enter into the merger agreement, *there would likely be few, if any, other parties that would be willing to make an offer in excess of SSC's offer of $1.97 per ordinary share*;" and

(iii) "[t]he terms of the merger agreement permitting GAN to consider a 'superior proposal' received after November 7, 2023 and at any time prior to approval of the merger proposal by GAN shareholders," and change its recommendation to vote in favor of the Merger in response to such a superior proposal. (Proxy at 29-30).

Without disclosing whether or not Bidders A, B, C, D, E, F, G, H, and/or I were subject to standstill provisions that did *not* fall away if a transaction was announced, reasonable GAN stockholders would be left with the misleading impression that all of the above bidders were free without restrictions to (i) submit bids in excess of $1.97 per share in cash after the Merger was announced, and (ii) have such bids fully considered by the Board as potentially "superior proposals."

53.     The nondisclosure of any standstill provisions is particularly concerning with respect to Bidder B, which on January 13, 2023, offered to acquire GAN's B2C sports betting business *alone* for a purchase price of $98 million on a cash-free, debt-free basis, payable in installments of $35 million at closing, with the remaining $63 million payable upon achievement of performance-based milestone targets. Since the Proxy discloses that GAN had 44,989,747 ordinary shares issued as December 4, 2023, the Merger Consideration of $1.97 per share is equal to $88.63 million in consideration in the aggregate, which is *lower than* the $98 million in cash that Bidder B offered for GAN's B2C sports betting business *alone* on January 13, 2023. Thus, whether Bidder B was free to submit a topping bid after the Merger was announced without any restriction is a material consideration for GAN stockholders.

***Material Omissions Concerning the Implied Value of GAN Under Bidder H's Reverse Merger Proposal***

54.     Once a board makes a partial disclosure in a proxy concerning the history leading up to the approval of a transaction, the board is obligated to provide the stockholders with a full and accurate disclosure of that history, including disclosure of the amounts of the bids in any proposals for alternative transactions submitted by other bidders. *See Vivendi*, *supra*; *see also Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280-82 (Del. 1994).

55.     Here, the Proxy discloses that, on August 5, 2023, the Merger Special Committee determined, after consultation with B. Riley, that the valuation for GAN implied by the reverse merger proposal of Bidder H (giving GAN stockholders 30% of the combined post-Merger company) was worth less than the all-cash proposal contemplated by the revised non-binding letter of intent received from SEGA on August 1, 2023, which was $2.51 per share in cash. Subsequently, however, the Merger Special Committee and SEGA agreed to a price of $1.97 per share in cash. While the implied value of GAN under Bidder H's reverse merger proposal may have been less than $2.51 per share in cash, it may have exceeded the $1.97 per share in cash ultimately agreed upon. Without disclosure of the implied value of GAN under Bidder H's reverse merger proposal, GAN stockholders cannot compare the Merger Consideration to the implied value of GAN available under Bidder H's reverse merger proposal.

56.     Further, as noted, the Proxy states that, as a positive factor in favor of approving the Merger, "dozens of leading gaming industry participants in the casino, online casino and online sports betting industries throughout the world were approached on behalf of GAN ***and no party expressed a willingness to make an offer in excess of the $1.97 per ordinary share SSC has agreed to pay***;" and (ii) "[t]he possibility that, if GAN did not enter into the merger agreement, there would likely be few, if any, other parties that would be willing to make an offer in excess of

SSC's offer of $1.97 per ordinary share." But without disclosure of the implied value of GAN under Bidder H's reverse merger proposal, GAN stockholders have no way of confirming whether Bidder H "expressed a willingness to make an offer in excess of the $1.97 per ordinary share SSC has agreed to pay" since the Proxy never states that the implied value of GAN under Bidder H's reverse merger proposal was lower than $1.97 per share in cash.

***Material Omissions Concerning the Fairness Opinion***

57.     A financial advisor's fairness opinion is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders. Here, the Proxy's presentation of the Fairness Opinion improperly failed to disclose certain key information underlying the analyses on which such Fairness Opinion was based. Without this information, as described below, GAN stockholders are unable to fully understand these analyses, and thus are unable to determine what weight to place on the Fairness Opinion in determining whether to vote for the Merger. This omitted information, if disclosed, would significantly alter the total mix of information. *See Chen*, 2019 WL 6139014, at *2, 13.

58.     With respect to B. Riley's *Premium Paid Analysis*, the Proxy states that B. Riley "reviewed the stock price premiums paid in transactions during the last three years on or prior to November 3, 2023 involving small-cap technology company targets (with a market capitalization of less than $1 billion one day prior to the applicable transaction) trading on a major U.S. exchange, which resulted in 47 transactions. The Proxy fails to disclose, however, any information concerning any of these transactions, including the parties, deal values, and premiums paid in each transaction. These material omissions render the *Premium Paid Analysis* misleading since they prevent GAN stockholders from being able to evaluate the validity of B. Riley's *Premium Paid Analysis* in terms of whether the relevant transactions were comparable to the Merger.

59.     With respect to B. Riley's *Discounted Cash Flow Analysis*, the Proxy states that B. Riley used a discount rate of 21.6%, but fails to provide any disclosure concerning how B. Riley determined that 21.6% was an appropriate discount rate (such as using the risk free rate, U.S. equity premium, and beta adjustments to determine a weighted average cost of capital for GAN). Ensuring that B. Riley used an appropriate discount rate in its DCF analysis is material to GAN stockholders since if the discount rate range used by B. Riley was artificially high, it would have depressed the value ranges generated for GAN's shares. *See In re Topps Co. S'holders Litig*., 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range). The DCF analysis is thus rendered misleading.

60.     With respect to B. Riley's *Selected Transactions Analysis*, the Proxy discloses that B. Riley reviewed certain financial terms of certain transactions involving target companies that B. Riley deemed relevant. The financial data reviewed included enterprise value as a multiple of revenue for the last 12 months available prior to the date of announcement, or "LTM Revenue." The Proxy then identifies over 100 transactions involving target companies in the gaming industry that closed between April 21, 2018, and July 17, 2023. The Proxy does not disclose, however, the enterprise values for any of the target companies in any of these transactions. The omission of the enterprise values for each of the target companies renders the *Selected Transactions Analysis* misleading since it impairs the ability of GAN stockholders to evaluate the validity of the *Selected Transactions Analysis* for themselves in terms of whether each of the selected target companies are sufficiently comparable to GAN.

61.     With respect to B. Riley' *Selected Companies Analysis*, the Proxy discloses that B. Riley reviewed certain financial data for selected companies with publicly traded equity securities that B. Riley deemed relevant. The financial data reviewed included enterprise value as of

November 3, 2023, as a multiple of adjusted EBITDA for the year ending December 31, 2025, or "2025E Adjusted EBITDA." The Proxy then identifies over 30 companies in the gaming industry used in the analysis. The Proxy does not disclose, however, the enterprise values for any of these companies. The omission of the enterprise values for each of these companies renders the *Selected Companies Analysis* misleading since impairs the ability of GAN stockholders to evaluate the validity of the *Selected Companies Analysis* for themselves in terms of whether each of the selected target companies are sufficiently comparable to GAN.

## CLAIMS FOR RELIEF

## COUNT I

### Against All Defendants
### for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

62.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

63.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

64.     Defendants disseminated a false and misleading Proxy, which made statements that are false and misleading, and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

65.     By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

66.     Yet, as specified above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and/or (ii) omitted material facts from the Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce GAN stockholders to vote in favor of the Merger. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

67.     The material misrepresentations and omissions in the Proxy specified above are material insofar as a reasonable GAN Stockholder would view disclosure of the omitted facts specified above as significantly altering the "total mix" of information made available to GAN stockholders.

68.     Since, according to the Proxy, approval of the Merger by a simple majority of GAN stockholders is "necessary to complete the Merger," the Proxy soliciting the votes of GAN stockholders is an essential link in the accomplishment of the Merger. Thus, causation is established.

69.     Plaintiff and other GAN stockholders have no adequate remedy at law, and are threatened with irreparable harm insofar as Plaintiff and other GAN stockholders will be deprived of their entitlement to cast fully informed votes with respect to the Merger if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore,

injunctive relief is appropriate.

## COUNT II

**Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

70.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of GAN within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of GAN, and participation in, and/or awareness of the negotiation of the Merger, and/or intimate knowledge of the contents of the Proxy filed with the SEC in order to solicit the votes of GAN stockholders to vote in favor the Merger, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of GAN with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that are materially false and misleading, and the omission of material facts specified above.

72.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.     Each of the Individual Defendants had direct and supervisory involvement in the negotiation and approval of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same.

74.     By virtue of the foregoing, the Individual Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and

omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

75.     Plaintiff and other GAN stockholders have no adequate remedy at law, and as a result of the Individual Defendants' violations of Section 20(a) of the Exchange Act, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger. Therefore, injunctive relief is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to GAN stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

B.     Finding Defendants liable for violating Sections 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

C.     Finding the Individual Defendants liable for violating Section 20(a) of the Exchange Act;

D.     Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff and other GAN stockholders rescissory damages;

E.     Directing Defendants to account to Plaintiff and other GAN stockholders for all damages suffered as a result of their misconduct;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' fees and expenses; and

G.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: January 3, 2024                              **WOHL & FRUCHTER LLP**


                                                    By:/s *Joshua E. Fruchter*
                                                    Joshua E. Fruchter (JF2970)
                                                    25 Robert Pitt Drive, Suite 209G
                                                    Monsey, NY 10952
                                                    Tel: (845) 290-6588
                                                    Fax: (718) 504-3773
                                                    Email: jfruchter@wohlfruchter.com

                                                    *Attorneys for Plaintiff*